COX, J.
11Following a trial by jury, Rashard Neal was unanimously convicted as charged of second degree murder, in violation of La. R.S. 14:30.1. Neal was sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension. Neal appeals only his conviction. For the following reasons, we affirm his conviction and sentence.
FACTS
At 8:32 p.m. on the evening of September 4, 2014, the Madison Parish Sheriffs Office in Tallulah, Louisiana, received a report of a shooting at a local carwash. When deputies arrived at the scene, they discovered that Lapatrick Mitchell[1] had been shot and killed. Shortly before the shooting, several witnesses saw Mitchell and Neal engaged in a heated argument at the carwash over money. Neal conceded that the argument had occurred, but denied killing Mitchell. At trial, two eyewitnesses claimed that they saw Neal return to the carwash and shoot Mitchell.
A 9mm handgun was found on the rear passenger floorboard of Mitchell’s vehicle, but it had not been fired. Three spent .40 caliber shell casings were also found at the scene. No physical evidence connected Neal to the crime, and no weapon was recovered. Neal’s cellphone had little text message activity from 6:53 p.m. until 8:28 p.m. No witness could pinpoint the timing of the events. Based upon the eyewitness accounts, however, Neal was arrested the day after the shooting.
LOn December 8, 2014, Neal was charged by a grand jury indictment with the second degree murder of Mitchell. Neal’s five-day trial ended on June 11, 2016, when a unanimous jury found him guilty as charged of second degree murder.
On June 16, 2016, Neal was sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal followed.
DISCUSSION
On appeal, Neal argues that the evidence was insufficient to prove beyond a reasonable doubt that he was the person who shot Mitchell. Although he admits that he had an argument with Mitchell, Neal contends that the two eyewitnesses who claimed they saw him shoot Mitchell gave inconsistent versions of the event to police and were not credible witnesses. Additionally, Neal argues that no evidence linked him to the crime. Specifically, no murder weapon was ever found and no gun recovered matched the spent casings found at the crime scene. Finally, Neal argues that *485 detectives failed to investigate another possible suspect.
The state argues that the testimony of the two eyewitnesses identifying Neal as the shooter was sufficient to prove the elements of second degree murder. The state contends that investigations conducted by law enforcement corroborated the testimony of the two eyewitnesses and also provided a supporting timeline of the events. Ultimately, the state argues that witness credibility issues are reserved for the trier of fact. The state submits that, when viewed in the light most favorable to the state, the' evidence would lead [¡¡any rational factfinder to find that the elements of second degree murder were proven beyond a reasonable doubt.

Law

Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), appellate courts review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of a -crime had been proven beyond a reasonable doubt. State v. Tate, 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La. 2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La. 11/6/09), 21 So.3d 297.
It is the function of the trier of fact to assess the credibility of witnesses and resolve conflicting testimony. State v. Washington, 50,424 (La.App. 2 Cir. 3/16/16), 188 So.3d 350. The trier of fact hears the testimony firsthand and, unless the factfinder’s assessment of believability is without any rational basis, it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La. 1988); State v. Price, 48,986 (La.App. 2 Cir. 5/15/14), 140 So.3d 1212, writ denied, 14-1274 (La. 2/6/15), 158 So.3d 814. A factual determination concerning conflicting testimony will not be disturbed on review unless it is clearly contrary to the evidence. Mussall, supra; State v. Williams, 32,631 (La.App. 2 Cir. 12/8/99), 747 So.2d 1256, writ denied, 00-40734 (La. 11/27/00), 775 So.2d 441, and writs denied, 00-0358, 00-0360 (La. 1/5/01), 778 So.2d 588.
A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 07-1209 (La. 12/14/07), 970 So.2d 529; State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, unit denied, 02-3090 (La. 11/14/03), 858 So.2d 422. The appellate court does not assess the credibility of witnesses- or reweigh the evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442; State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Brady, 414 So.2d 364 (La. 1982); State v. Brock, 37,487 (La.App. 2 Cir. 9/26/03), 855 So.2d 939, writ denied, 04-1036 (La. 4/1/05), 897 So.2d 590; Williams, supra. Fáce-to-face transactions taking place during daylight hours and the length of time that transpires during the altercation are facts that reduce the likelihood of misiden- *486 tification. State v. Ruano, 12-1517 (La.App. 4 Cir. 7/31/13), 120 So.3d 908, writ denied, 13-2068 (La. 3/14/14), 134 So.3d 1193; State v. Payne, 04-828 (La.App. 5 Cir. 12/14/04), 892 So.2d 51.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. |s14:30.1. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Wilhite, 40,539 (La.App. 2 Cir. 12/30/05), 917 So.2d 1252, unit denied, 06-1078 (La. 11/9/06), 941 So.2d 35. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La. 1982); Wilhite, supra. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
Positive identification by only one witness may be sufficient to support a defendant’s conviction. State v. Davis, 27, 961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428, writ denied, 97-0383 (La. 10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La. App. 2 Cir. 1990), writ denied, 566 So.2d 983 (La. 1990). Additionally, a jury may consider flight and attempts to avoid apprehension as evidence of a guilty conscience. State v. Fuller, 418 So.2d 591 (La. 1982); State v. Wiggins, 44,616 (La.App. 2 Cir. 9/23/09), 22 So.3d 1039, writ denied, 09-2329 (La. 4/23/10), 34 So.3d 271.

Trial Testimony and Evidence

Officer Ezell of the Madison Parish Sheriffs Office was the first to testify at trial. Officer Ezell testified that he assisted in the investigation on September 4, 2014, and was one of the first responders to the crime scene. He stated that he took two statements from Neal, who turned himself in one Rhour after the shooting. In Neal’s first statement to Officer Ezell, Neal denied killing Mitchell, but admitted to having a heated argument with. him. In a second, statement, made on September 5, 2014, Neal again denied shooting Mitchell. Officer Ezell testified that Neal was arrested after giving the second statement because the investigation had disclosed two eyewitnesses who claimed they saw Neal shoot Mitchell. The two eyewitnesses were Lester Solomon and Mose Rone.
Officer Ezell interviewed Lester Solomon and took his statement. According to Officer Ezell, Solomon stated- that at the time- of the shooting, he was seated on the driver’s side of the vehicle, and Mitchell was- standing on the passenger side at the rear door. Solomon stated that both the front and back passenger doors of the vehicle were open, as well -as the back hatch. In his statement, Solomon stated that Mitchell was washing his vehicle when Solomon “heard a pop, like a gunshot.” Solomon stated that he looked up-and “saw Rashard Neal - shoot Lápatrick Mitchell.” On September 5, 2014, Solomon took Officer Ezell to the carwash and showed him how thé crime took place. The vehicle was placed exactly where it had been at the time of the shooting. Officer Ezell testified that he stood where Solomon had been standing and looked through the window. Officer Ezell stated that he could clearly see through the window to where.Lapa-trick Mitchell would have been standing at the time of the shooting. Officer Ezell tes- *487 tiffed that he believed Solomon’s statement was accurate.
On cross-examination, Officer Ezell testified that Solomon stated that he ran “out of his shoes at the time of the shooting,” and that there were “two shoes there where he said he was standing when the shooting took place.” ^Officer Ezell also conceded that Solomon gave another conflicting statement to investigators.
Detective Brandon Wilcher, an investigator with the Madison Parish Sheriffs Office, was the next to testify. Detective Wilcher testified .that he. arrived at the crime scene at 8:40 p.m. where he observed Mitchell’s body, Mitchell’s vehicle .with the headlights on and the motor running, and both the front and rear passenger doors open, as well as the rear lift gate. Detective Wilcher could tell that Mitchell had been cleaning his car due to the cleaning supplies present at the scene. After Mitchell’s body had been removed from the scene, Detective Wilcher began to process and preserve the crime scene. As a firearms instructor for over 16 years, he testified that Mitchell’s wounds were considered “kill zone wounds.”
. Detective Wilcher confirmed that a pair of flip flops were found at the scene. He identified photographs from the scene, which included a shell casing found near the body, a bloody footprint, a 9mm handgun found on the rear passenger side of Mitchell’s vehicle, and a shell casing found near the cleaning supplies. Detective Wil-cher testified that loud music was coming 'from Mitchell’s vehicle when he arrived at the scene. Detective Wilcher stated that he collected Neal’s clothing and cell phone as evidence to be tested.[2] However, Detective Wilcher testified that there was no indication that the collected clothes were the clothing worn by the assailant at the time J&of the shooting, as the assailant was not immediately detained at the crime scene.
Detective Wilcher stated that witnesses described the Vehicle Neal drove at the time the argument occurred between Neal and Mitchell prior to the sho'oting. Detective Wilcher testified that Neal’s car, which had been towed, was processed, but no items were found in the vehicle besides a large amount of clothing in the trunk.
The day after the shooting, Detective Wilcher testified that he and another deputy traveled to a hotel in yicksburg, Mississippi, where they received information that Neal was staying with a woman. By the time they arrived and searched the- hotel room, Neal had turned himself in to the police.[3]
Detective James Rash of the Madison Parish Sheriffs Office testified that he was the designated' case agent for Mitchell’s murder on September 4, 2014. Detective Rash performed a walkthrough of the scene and corroborated Detective Wil-cher’s testimony regarding what was recovered. Although he retrieved a 9mm gun from Mitchell’s vehicle located on the right rear floorboard, Detective Rash testified that the gun had not been fired.
Detective Rash testified that Solomon did not initially identify the black male from the shooting. After learning that Solomon had gone to a local dollar store *488 immediately after the shooting, Detective Rash had the manager pull up the video. Detective Rash testified that he saw Solomon “running into the store” and turning around “holding the door looking back Ifltowards the carwash.” Detective Rash saw that Solomon was in his “sock feet.”
Detective Rash learned from other witnesses that there was a heated argument between Mitchell and Neal before the shooting. After Neal turned himself in, Detective Rash learned from him that a couple of years before the shooting, Neal was fronted approximately $1,500.00 worth of drugs by Mitchell. Neal indicated that because someone stole the drugs from him, he was unable to pay Mitchell, which led to the argument, Neal told Detective Rash that he had been at an apartment earlier talking to Madarrel Miller who informed him that Mitchell had been saying things about Neal. Neal stated that he called Mitchell and the two argued over the phone. After Neal hung up, Mitchell called back and told Neal he was at the carwash. Neal admitted going to the carwash with Isaac Green. Neal stated that Mitchell kept telling him to get back. From this information, Detective Rash testified that he surmised that Neal was the aggressor. Detective Rash also learned from Neal that Mitchell may have had a gun in his .pants; however, Neal stated that he did not believe Mitchell would shoot him.
Detective Rash testified that Madarrel Miller confirmed he told Neal that Mitchell had been talking about him. Miller also confirmed that Neal and Green left the apartment complex to go to the carwash after a phone call with Mitchell and returned later. On cross-examination, Detective Rash testified that Miller stated the phone calls between Neal and Mitchell occurred around 8:00 p.m. on September 4, 2014.
| ^Detective Rash testified that three eyewitnesses verified that Neal and Mitchell argued at the carwash.[4] He learned that Neal had left his car at his cousin’s house on the night of the incident. When speaking to Neal’s cousin, Charmaine, Detective Rash discovered it was “unusual” for the car to be there.
Detective Rash interviewed Charles Richardson, who led him to Mose Rone, an eyewitness to the shooting. Detective Rash testified that Rone admitted being at the scene where he witnessed Neal shoot Mitchell. Rone informed Detective Rash that Solomon was also at the scene of the shooting. On cross-examination, Detective Rash testified more specifically about the statement he received from Rone. Rone claimed that at about 8:00 p.m., he walked to a convenience store by himself about a block and a half away from the carwash. Rone stated he did not see the confrontation between Neal and Mitchell. However, Detective Rash testified that Rone stated he “was standing at the back of the car-wash,” when Neal walked up “wearing all black.” Detective Rash testified that no black clothing was recovered. He stated that, according to Rone, as Neal walked up, Mitchell did not see Neal produce a gun. As he was standing there, Neal “pulled the gun, shot Lapatrick Mitchell.” Detective Rash stated that Rone told him Neal fired “three shots, turned the gun on him, had him on the ground” and threatened Rone and his family. Detective Rash testified that Rone stated that Solomon was seated in the driver’s seat in Mitchell’s vehicle at the time of the shooting.
*489 | nDetective Rash also interviewed Charles Carter, Jr., and learned that after the shooting, Miller brought a red shirt holding approximately two pounds of marijuana into his residence. Miller claimed he got the drugs from Neal. According to. Detective Rash, Carter also stated that Neal and Green came back to his apartment later that night—around 9:00 p.m. Neither Carter nor Miller saw anything that indicated that Neal or Green had shot anyone. Detective Rash stated he also took a statement from Green wh’o corroborated Miller’s information about what transpired at the apartments. .
Detective Rash was shown Neal’s phone records and was able to determine that Neal called Mitchell and Mitchell returned the phone call at 8:06 p.m. on September 4, 2014. Detective Rash testified that the first 911 call about the shooting came in at 8:32 p.m. He testified that there was very little activity on Neal’s phone from approximately 8:19 p.m. to about 8:44 p.m. From the records, Detective Rash stated he was able to confirm Miller’s story that Neal made contact with Miller after the shooting.
On- cross-examination, Detective Rash stated that the weapon used to shoot Mitchell was not found. He also ruled out Green as a suspect because he did not fit the description of the man who shot Mitchell, and no witness identified Green as the shooter. Neal gave Detective Rash the name of Jaylon Richardson as a suspect, but no evidence linked him to the crime. Detective Rash did concede that Solomon gave two statements and changed his story the day after the crime.
Detective Rash corroborated Detective Wilcher’s testimony that Mitchell’s vehicle was running, the lights were on, and there was loud music | ^playing. Detective Rash stated that the rear passenger door of the vehicle was open, and the back hatch of the vehicle was up.
Justice Bowman testified that on the evening of September 4, 2014, she saw the argument between Neal and Mitchell as she was in the dollar store parking lot. She described the argument as heated and stated that the two men were in arms’ reach of each other. Bowman testified that she saw Solomon pass by and spoke to-him. After she finished speaking with Solomon, Bowman was picked up by a friend and went home. About five to seven minutes later, Bowman learned from her brother and cousin that Mitchell had been shot. Bowman testified that she “felt” like Neal -had killed Mitchell because she had just seen them arguing. Bowman confirmed that she did not see Neal shoot Mitchell and did not see any weapons during the argument. Bowman explained that she did not give a statement in 2014 because, “the killer has not been caught and I was a little, nervous.”
On cross-examination, Bowman recalled that she spoke with Solomon no longer than two minutes during the’ argument. Bowman testified that the argument took place when it “was getting dark outside.” Bowman stated that she could not tell if Mitchell had a gun, and she did not recall Neal being with anyone else at the car-wash. Bowman gave a recorded statement to Detective Rash in which she indicated that she saw Neal speed off after the argument.
Benjamin Reed testified that on September 4, 2014, he and his wife, Jaliceea Reed, drove up to the carwash when Neal and Mitchell were arguing at “first dark.” Reed stopped because he knew both men and wanted to know what was. going on: Reed stated that he noticed Neal “was real upset,” but that Mitchell “really wasn’t upset.” According to Reed, the argument was ha“very loud,” and Neal and Mitchell argued to the “point they was about to fight.” Reed heard Neal tell Mitchell, “you *490 pulling guns and shit, you better be glad I ain’t got none.” After that exchange of words, Reed testified that he walked up to the passenger side of Neal’s vehicle, which he described as a “Grand- Marquis.” Reed recalled that Neal had a passenger.with him, but did not know who he was, Reed testified that the “guy in the passenger seat was like, be cool, as if we gone handle this later, you know, just get in the car.”
Reed testified that he talked to Neal through the back window and asked 'him if everything was okay. According to Reed, Neal stated that “old bitch ass nigga pulled a gun on me.” Reed testified that he never saw a gun, but did see a black hoodie and mask on the back passenger side of Neal’s vehicle. After Neal sped off, Reed testified that he walked over to Mitchell who was still cleaning his vehicle. Reed testified that during their short conversation, Mitchell stated that Neal “ain’t handle business correctly.” Reed, stated that the two were talking, but were interrupted by a phone call, so Reed left. Reed testified that he had noticed that Solomon was present at the scene standing by the front passenger headlight and texting on his phone.
Reed stated that he and his wife left the carwash to go shopping for not “more than about five or ten minutes.” Reed testified that “by the time we made it back to the vehicle together, then we heard the gunshots.” Reed believed he heard about three gunshots. ...
On cross-examination, Reed stated he was at the carwash for about five minutes. He also. stated that there was no way Mitchell could have pulled a gun “cause it was all the way down in his pocket.” Additionally, Reed testified that he understood Green’s words to Neal, in street, to mean that “we | ugone be back.” Reed stated that there was no loud music when he was present, and Mitchell’s vehicle was not running when the men were arguing. Reed testified that Neal left “a good three- minutes” before Reed when it was “first dark.”
Jaliceea Reed corroborated her husband’s testimony. .Jaliceea never saw a weapon during the argument, ñor did she see Mitchell make any threatening gestures toward Neal. In her opinion, Neal was the aggressive-acting one in the fight. Jaliceea testified that she did not know who shot Mitchell. On cross-examination, Jaliceea stated that she noticed somebody at the back of Mitchell’s vehicle and somebody in the back of Neal’s vehicle, but she did not know the identity of either man. Jaliceea testified that she did not know what time they arrived at the carwash, but stated it was fully dark outside. ■
Mose Rone testified that he knew both Mitchell and Neal. Rone stated that he was at- the carwash when the shooting happened on September 4, 2014. At the time of the shooting, Rone was leaving the bait shop and stopped to speak with Mitchell. Rone stated that Solomon was sitting in the passenger side of Mitchell’s vehicle, and Mitchell was washing the back tire rim. Rone saw no other people around at that time. As Rone was getting ready to leave, Neal “came up” and asked Mitchell “what that was you had said.” According to Rone, Mitchell told .Neal to go about his business. Rone recalled that Neal had on a hoodie, black pants, and black shoes.'
Rone testified that Neal told him to “get on the ground.” Rone complied and “that’s when I heard gunshots. He shot him.” When Rone was on the ground, he “looked back and looked at him when he had shot him.” |1fiRone testified that Neal told him that he would “kill me and my family, he know where I stay at.” -Rone stated that at the time of the shooting, it was just getting dark- and he did not see anyone with Neal when he came up and shot Mitchell. He *491 stated that he did not witness or know anything about the argument between Neal and Mitchell.
According to Rone, when Neal took off running, he ran to find Charles Richardson at a house in the Scurrier Flats neighborhood. Richardson then ran to the police station, and Rone returned to the carwash to stay with Mitchell. When Rone returned, he saw Solomon standing in front of the vehicle, shaking.
On cross-examination, Rone testified that he estimated it took him about five minutes to get from the carwash to the bait shop and back. Rone stated he did not stay long at the bait shop. Rone recalled that Mitchell’s vehicle was running, but he did not hear any music. Rone testified that as he talked to Mitchell, Neal came from the front of the truck, down the passenger side of the vehicle. Rone stated that when Neal arrived, he saw a black pistol. According to Rone, Solomon was still in the passenger side seat with the doors closed and. the windows up.. Rone testified that Solomon told him he ran to the-dollar store to get help. After the shooting, Rone did not find Solomon, but ran to his home to get help.
When questioned about his September 5, 2014, statement that the shooter shot first and then told Rone to get on .the ground, Rone stated, “that ain’t the truth.” Additionally, Rone agreed that in his. statement he said that nobody saw the shooter but him, but testified that Solomon could have seen the shooter.
116Charles Richardson testified that on September 4, 2014, he was walking his dog and ran into Solomon, Mitchell, and Rone at the carwash. Richardson talked to the men for about ten minutes before he went to “Lil Fred’s” house in Scurrier Flats at “first dark” around ;8:00 p.m. Richardson stated that he did not see Neal at the carwash, but was able to identify him in the courtroom because he considered Neal a friend. Richardson testified that he did not see any fights or a shooting on September 4, 2014. On that evening, however, after Solomon went to Fred’s house, he testified that Rone “run around there and say Rashard done killed Turbo.” Richardson testified that he heard .gunshots, about a minute before Rone ran to his .house. Richardson stated that he went' to the carwash where he saw- Mitchell down on the ground. He then ran.across the highway to the sheriffs department for help.
On cross-examination, Richardson said that Mitehell, Solomon, and Rone wanted to see the pit bull he was walking, which was his reason for visiting the carwash. Richardson testified that Fred came, with him to the carwash, and the two left after five or ten minutes. Richardson stated that he did not know where the shots were coming from' or how many gunshots were fired. Additionally, Richardson testified that Mitchell’s vehicle was not running and he- did not hear any loud music. ■ ■
Lester Solomon testified that he grew up with Mitchell, who was like a brother to him. Although Solomon knew Neal, he did not consider him a friend. Solomon identified Neal in court as the man who killed Mitchell. Solomon testified that he was “one hundred percent without a doubt positive” that Neal killed Mitchell on September 4, 2014. Solomon testified that on |17that date, he witnessed an argument between Neal and Mitchell over money, but he could not recall the time of the argument. According to Solomon, Neal owed Mitchell money for drugs. Solomon stated there were telephone conversations between Neal and Mitchell before the argument.
.Before the argument, Solomon testified that he, Rone, Richardson, and Fred were at the carwash. When the argument oc *492 curred, Solomon recalled that he, Mitchell, Neal, Green, Reed, and Bowman were present. Solomon confirmed that he spoke with Bowman during the argument. Solomon described the argument as “heated,” meaning “face to face about to fight.” In Solomon’s opinion, Neal was more aggressive than Mitchell. Solomon testified that Mitchell had a weapon on him in his pocket when the argument took place. Solomon stated that Mitchell’s shirt was small, so the gun was visible. Solomon recalled that Neal asked Mitchell, “you got a gun huh.” Solomon stated that Mitchell took the gun out of his pocket and put it in the backseat of the vehicle so he and Neal could fight. According to Solomon, once Mitchell put up the gun, Neal’s “whole voice changed. He didn’t want to fight.” Solomon recalled that Mitchell and Neal argued and talked for a little while longer, and then Neal got into his vehicle, hollering. Solomon testified that Mitchell told Neal to go about his business.
Solomon stated that about ten minutes after the argument, Rone and Richardson came back “around.” The men talked about cars and a pit bull. Solomon stated that he got into the passenger seat of Mitchell’s vehicle because he was scared of the dog. Solomon stated that he did not know if Rone saw him in the passenger seat of Mitchell’s vehicle. Solomon recalled that all of the doors of Mitchell’s vehicle were closed at this time. According |1sto Solomon, the men visited for about fifteen minutes and then “went back down there by the store.” Only Mitchell and Solomon remained at the carwash.
Solomon testified that he got out of the passenger side of Mitchell’s vehicle and went to the driver’s side where his phone was charging. Solomon stayed in the driver’s seat for a little bit before he got out and leaned on the side of the truck on the fender, on the “hood part.” Solomon testified that he was not playing music, and the truck was not running. Solomon stated that at the time of the shooting, the driver’s side door and both passenger side doors were open. Solomon testified that while Mitchell was cleaning his vehicle, he and Mitchell talked about a car show; Solomon was looking at photographs of cars on his phone. About ten minutes after this, Solomon stated that shots were fired. Solomon recalled that when two shots were fired, he “crouched down, then I had rolled back up when the last shot was fired, and I had seen Neal,” who had on a black hood-ie. Solomon testified that he was sure the man was Neal because he could see his face. Solomon testified that he saw Neal looking through the windshield, where he could see his face. Because both passenger doors were open, nothing obscured Solomon’s view. At this time, Solomon testified that he was leaning on the truck trying to see if Mitchell had gotten out of the way.
According to Solomon, after the third shot, he tried to call 911 on his cellphone, but the operator acted like she could not hear or understand him. Afterwards, Solomon looked over at the dollar store and saw a close family member’s car there. Solomon testified that he walked through the door and told them Mitchell had been shot. As Solomon continued to try to call 911, hflhe went over to the sheriffs office, but they said someone had already come in about the shooting. He stated he then went back to where Mitchell was at the carwash. Because the officers would not let Solomon touch Mitchell, he started the vehicle and opened the back gate in order to take Mitchell to the hospital because the paramedics were too slow. Solomon testified that when he left the crime scene, the back of the vehicle and side doors were open. He recalled that the driver’s side door was closed and no music was playing.
*493 Solomon stated that he saw Rone after the shooting. He was not sure if he saw Rone before the argument, but recalled seeing him after the argument before the shooting. Additionally, Solomon testified that he wore flip flops the night of the shooting and left them at the scene when he ran for help. He described the flip flops as “black Nike slippers.”
Solomon gave two recorded statements. Solomon admitted that in his first statement given on the night of the shooting, he mentioned a mask and stated that he did not know who shot Mitchell. Solomon testified that he lied in his first statement because he “wanted to take matters into my own hands,” meaning he “wanted to do the same thing to him what he did to Lapatrick.” Solomon stated that he was “hurt and angry” at the time of the first statement. Solomon gave a second statement the next day, after he had time to rest. In his second statement, Solomon “told the truth, that I had seen Rashard kill Lapatrick. That it wasn’t no mask involved.” Solomon testified that he changed his story after talking to his grandmother who told him not to get into any more trouble and to tell the truth.
On cross-examination, Solomon conceded that in his first statement he indicated he was on the phone the whole time. Additionally, Solomon stated lanthat Rone stayed at the carwash while Mitchell was washing his vehicle and only left a few times to go to the store. Solomon testified that on those occasions, Rone was gone for about five minutes before he would come back. Solomon testified that Neal was driving a burgundy Grand Marquis when he arrived with Green at the carwash. According to Solomon, Green was sitting in the passenger seat of Neal’s vehicle and never got out of the car. Solomon stated that Mitchell put his gun away, but he never saw Neal with a gun. Solomon testified that he did not know if Rone was at the carwash when the shots were fired because he was not paying attention. Solomon also testified that Mitchell’s truck was not running during the shooting. At the time of the shooting, Solomon said that Mitchell’s door was open because he was cleaning the running boards on the passenger side back door. According to Solomon, the back door was shut at the time of the shooting.
John Asmussen, a qualified expert in digital forensics, testified that he examined a Samsung Model SGHA157 phone that belonged to Neal. Asmussen examined Neal’s phone looking for specific text message activity between 5:00 p.m. and 10:00 p.m. on September- 4, 2014. Asmussen testified that- no text messages were sent or received on Neal’s phone from 6:53 p,m. until 8:28 p.m., with the exception of one text that said “get” which was attempted to be sent at 6:53 p.m., but did not go through. In Asmussen’s opinion, this was a significant time period of a gap where there was no activity on the device. As-mussen testified that on September 4, 2014, at 10:44 p.m., there was an incoming text from an unidentified- number which said “call me wheneva you done handling business.”
latOn cross-examination, Asmussen .testified that the unsent message would have been an outgoing message from Neal’s phone. Asmussen stated that during the time period between texts, the person may have been doing something. Asmussen conceded that the 10:44 p.m. text message did not indicate what type of “business” was being referenced. Finally, Asmussen testified that on September 4, 2014, at 8:28 p.m., a text message was sent to Neal’s phone that began a text conversation that ended at 8:43 p.m.
Madarrel Miller first testified for the defense. Miller stated that on September *494 4,-2014, he was standing at the Tallulah Square Apartments with Neal, Carter, and Green when he heard Neal and Mitchell arguing on the phone. Miller stated that Neal had heard Mitchell had been saying something about him, and Neal called Mitchell right before dark. Miller heard Neal tell Mitchell that if he had something to say about him, to “say. it to him and you know, stop being everyone else in they business or whatever.” Miller believed that Mitchell told Neal that he wqs at the car-wash.
Miller stated that after the phone call, Neal and Green “went directly after him” at the carwash. Miller testified that he and Carter went inside the house,- and Neal and Green returned about fifteen minutes later. ■ Miller, Carter, Neal, and ■ Green talked for about fifteen to twenty minutes, after which time Neal and Green left Car-teras house. Miller stated that he believed Neal was going to take Green home.
Miller testified that Neal came back to Carter’s house with his sister, Shante Everett, when it was “night.” According to Miller, Neal brought him two pounds of marijuana to “hold it for him til he come from being questioned or whatever.” Miller gave two statements to law enforcement in 122which he was not truthful about the marijuana because he did not want to get in trouble. Miller was not sure what Neal wore that night, but thought he might have had on plaid pajama pants. Miller did not know if Neal had on different clothing at any time.
On cross-examination, Miller testified that he did not go to the carwash on September 4, 2014. Additionally, Miller denied telling Neal that Mitchell was talking about him. Miller did admit that he called Neal at 8:38 p.m. on September 4, 2014, but denied this was because he heard that Neal had killed Mitchell. On redirect, Miller stated that Neal called and told him he needed him to- hold his marijuana. Miller conceded, that, from the phone records, he had a conversation with Neal between 8:38 p.m. and 8:45 p.m. when Neal came to the apartment to bring the marijuana.
Charles Carter corroborated Miller’s testimony regarding what transpired at the Tallulah Square Apartments with Miller, Neal, and Green. Carter ' also -confirmed, that Neal came to his house three times on the evening of September 4, 2014, the last time to bring marijuana to Miller in a red shirt. Specifically, Carter, recalled that -Neal and- Green came back to his house about fifteen minutes after the argument and stayed .for about five or ten minutes before Neal took Green home. Carter remembered that Neal had on red and blue pajama pants, a red shirt, and black and red shoes. According to Carter, Neal did not change his clothes. On cross-examination, Carter testified that he was not at the carwash during Neal and Mitchell’s argument or at the time of the. shooting.
William Jones testified that he had known Neal for about five or six years. Jones saw Neal the morning after the shooting when he got off work. |⅞.-;Jones met Neal at “Yuck’s” house.[5] Jones did not stay at Green’s house for more than twenty minutes and went to Solomon’s grandmother’s house to check on Solomon. Jones testified that Solomon stated that he did not think Neal killed Mitchell. However, Solomon told Jones a day or two later that Neal did kill Mitchell. On cross-examination, Jones testified that he never told police that Solomon told him Neal did. not kill Mitchell.
Shante Everett testified that she took Neal to the sheriffs office; he was wearing *495 a red shirt with multicolored pajama pants. Everett admitted that she and Neal went to the Tallulah Square Apartments where Neal gave Miller marijuana wrapped in a red t-shirt. Everett stated that she never went to the carwash on September 4, 2014.
Gn direct examination, the defense called Detective Rash. Detective Rash was questioned about statements made by Jimmy Nale Watkins. Detective Rash did not dispute that Watkins stated that “he was driving by and he saw a black. SUV pull up.” Detective Rash testified that he knew Coonie Boon, a known drug dealer, drove a black Tahoe. Detective Rash stated, however, that Boon told him he was not talking to police because he was a drug dealer. Detective Rash said that Boon was not a suspect, but rather a witness. Detective Rash also testified that he did not* consider Jaylon Richardson to be a true suspect because “that was just jailhóuse talk.” Detective Rash conceded that he also took a statement from Bobby Brazil on September 8, 2014, and did not dispute the fact that Brazil also mentioned Jaylon Richardson’s name. On cross-examination, Detective Rash explained | ¡¡¿that he had nothing to make him believe that Brazil’s statement was in fact what happened on September 4, 2014, considering that he had two eyewitnesses -who stated they saw Neal shoot Mitchell.
The defense also questioned Detective Rash regarding the September '4, 2014, recorded statement of Isaac Green. Detective Rash testified that in the statement, Green stated that Neal picked him up at about 6:00 p.m. on September 4, 2014. The two rode around and went to Miller’s house. Green reported that it was Miller who told Neal that Mitchell was talking about him. In his statement, Green said that Neal called Mitchell, who told Neal not to call him about this “BS.” Green reported that Mitchell told Neal that he was at the carwash where Neal and Green went. Green also stated that Neal asked Mitchell “why you... got my name in your mouth.” Detective Rash recalled that Green stated he saw a gun in Mitchell’s •pocket and that Green told Neal.to leave. Detective Rash stated that Green described the argument and stated that Neal told- Mitchell he was “hiding behind that gun.” Detective Rash also testified that Green stated that he and Neal then went back to the “compress area” and hung, out for a few minutes before Neal took him home. According to Detective Rash, Green stated that.he was home for about five minutes when he learried that Mitchell had been shot. >
Rashard Neal testified on his own behalf. Néal acknowledged his criminal history, which included previous convictions for unauthorized entry and’possession of marijuana, as well as charges for criminal mischief, resisting an officer, and disturbing the peace. On the evening of September 4, 2014,“ Neal testified that he picked up Green around 6:00 p.m., and the two rode around for about an hour and a half before going to the Tallulah Square 12,-Apartments where Carter lived.[6] Neal claimed that he stood outside the apartments for about 30 minutes and did not go into the house at that time. Neal stated that he was playing music from his car, a burgundy Grand Marquis, which he had for about two weeks at the time. As Neal played music, Miller “pulled up” to where Neal was standing outside with Green and Carter. Neal stated that Miller told him he made a call to Mitchell when the two “had words” over money. Somehow, Mitchell indicated that he thought he was talking to Neal. Neal testified that although Miller told him not to call Mitchell, he called Mitchell *496 around 8:06 p.m. Neal stated that he asked Mitchell what was going on, and Mitchell hung up. However, Neal testified that Mitchell called back, asked Neal if he wanted “to do something,” and told Neal he was at the carwash.
Neal stated that he got in his car and went to the carwash with Green. Neal recalled that it was around 8:08 p.m. when they left the apartments. Neal estimated that it took him three to four minutes to get to the carwash. When they arrived, Neal got out of his car and began talking to Mitchell. Neal stated that the conversation “got deeper, we evolved into arguing.” Neal testified that Mitchell told him not to come up on him. At the time of the argument, Neal recalled that Solomon, Green, and Mitchell were present. After Neal got into his car, he saw Reed. Neal did not see Bowman at the carwash, however. After the argument, Neal stated that he made a phone call and went back to Carter’s house where Miller, Carter, and Carter’s children |2fiwere present. Green was still with Neal at this time. Neal testified that he told the men about the argument he had with Mitchell.
Neal claimed that he stayed at Carter’s house for about ten or fifteen minutes. During this time, he texted Patience Brown, a friend. From his phone records, Neal testified that he began texting Brown at 8:28 p.m. Neal’s phone records showed that Neal texted Brown back at 8:29 p.m., and the last text message in the conversation occurred at 8:46 p.m. Neal explained that there was no response to the two incoming texts because it was during the time he learned about Mitchell’s death.
Neal testified that he left Carter’s house at about 8:36 p.m. to drop Green off at his home; he was still texting Brown at this time. Neal estimated that it took him six or seven minutes to get from Carter’s house to Green’s house. After that, Neal testified that he headed to Brown’s house. However, Neal stated that he did not get to there because he called Brown, and she said she was not there. Neal testified that he then headed to another friend’s house. However, Neal did not make it there either because his sister called him. Neal testified that he then went to his cousin’s house where he received phone calls from Miller, his aunt, and other people about Mitchell’s death. From his phone records, Neal identified several phone calls from his aunt beginning at 8:42 p.m.
Neal recalled that his sister, Everett, informed him that Mitchell had been shot and told him that he needed to go to the police station because he had been implicated in the shooting. Neal parked his car at his cousin’s house, and Everett came to get him. Neal testified that the two did not go straight to the police station, but went back to the Tallulah Square 127Apartments. Neal called Mitchell to come outside and get the marijuana. Neal and Everett then went to the sheriffs office because Neal figured he needed to tell them about the argument. Neal testified that it was dark at this point, and he stayed in the sheriffs office from about 9:00 p.m. until 6:00 a.m. the following morning. While in the sheriffs office, Neal was swabbed for gunpowder residue and was told the test was negative. Neal testified that they took all of his clothes. He stated that he had on a red and white shirt with some pajama pants and burgundy and red Reeboks, which he voluntarily gave the officers. Neal testified that these were the same clothes he had on at the carwash. Neal gave a voluntary statement to law enforcement in which he stated he told them everything that happened aside from him going to drop off the marijuana because he thought he would get in trouble. However, Neal stated that he eventually told them about the marijuana.
*497 In -his statement, Neal denied shooting Mitchell. Neal also testified that he did not shoot- Mitchell. When he was released at 5:00 a.m.,the morning after the shooting, Neal initially went to his aunt’s house, but then went to Green’s house around 7:00 a.m. While at Green’s house, Neal, called William Jones and asked if he could bring cigarettes. Neal estimated that- he stayed at Green’s house for an hour and a half and then returned to his aunt’s house until later-that evening. Neal admitted that he tried to call Miller to get his marijuana, but was told that somebody stole it. Neal eventually went back to the sheriffs office on his own at around 9:00 p.m. for followup questions. When Neal arrived at the sheriffs office, he was arrested.
On cross-examination, Neal admitted that he did not initially tell police that he and Mitchell argued, but described it as a conversation. Neal stated |asthat he did not know if Mitchell had a' gun on him during the argument. Neal also stated that the ■witnesses were “exaggerating” about the argument.
Neal conceded that is was “very rare” for him to leave his car at his cousin’s house. Additionally, Neal denied that William Jones went to see Solomon to try to get him to change his story. 'Neal also testified that Miller -lied on the stand when he denied telling Neal that Mitchell was talking about Neal. With 'regards to the argument, Neal denied that the argument with Mitchell was about owing money for drugs, but insisted it was about “words.” Neal admitted that he told officers that Mitchell had fronted him money for drugs, but claimed that he paid Mitchell back. Neal also admitted that he left the argument with Mitchell upset, but denied ever having a gun.
Neal admitted that he also lied to law enforcement about calling Brown on the night of September 4, 2014. Neal conceded that he switched vehicles when he brought the’ drugs to Miller, but explained that his sister volunteered to take him. Neal denied cleaning his car out before he turned himself in, and he also denied owning a black hoodie or ever wearing black. Neal insisted that he wore red. Neal admitted that he and Brown spent the next night in Vicksburg, Mississippi, but Neal returned to Tallulah and left Brown in the hotel room.
On redirect, Neal admitted that there were no phone calls “during that time,” but that he was continually texting with Brown. Neal testified that he never felt threatened by Mitchell, whom he had known all of his life. Neal testified that he had problems with Rone who came by his house wanting to borrow marijuana. When Neal would' decline, Rone would get an attitude with him. After Neal’s testimony, both sides rested.

I29Sufficiency of the Evidence

This record provides ample support for the jury’s conviction of Neal for the crime of second degree murder. The testimony of both eyewitnesses, Rone and Solomon, if believed, was sufficient to prove that it was Neal who shot Mitchell after the two engaged in a heated argument witnessed by several people only a short time before the shooting. The testimony also negates any reasonable probability of misidentifieation.
The jury was made aware of Solomon’s initial statement that he did not see the shooter, as well as his second statement implicating Neal. The choice to believe this witness’ testimony remained within the province of the jury as a credibility determination. Even if Solomon’s testimony was rejected by the jury, Rone’s eyewitness identification of Neal as the shooter is sufficient to support the conviction. Any factual inconsistencies brought out during Rone’s testimony were unrelated to his eyewitness identification of Neal and could *498 have reasonably been discounted by the jury. Likewise, the jury was free to reject Neal’s claim that he did not shoot Mitchell. Evidence that Neal’s former girlfriend attempted to pay Solomon to change his story would certainly cast doubt on Neal’s version of the events.
Ultimately, the resolution of conflicting testimony about factual matters depends upon a determination of the credibility of the witnesses, and the matter is one of the weight of the evidencé, not its sufficiency. This Court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
Neal’s flight to Vicksburg, Mississippi, the day after the shooting, as well as text messages recovered from his eellphone discussing his plan to | anmove to Florida, could also be considered by the jury as evidence of a guilty conscience, Additionally, evidence showing the lack of text-activity bn Neal’s phone during the forty minutes prior to when police found Mitchell’s body is circumstantial evidence from which the jury could have inferred Neal’s guilt. Finally, the shooting of Mitchell three times in the “kill zone” is sufficient to establish the requisite specific intent. Thus, when viewed in the light most "favorable to the prosecution, the evidence was sufficient for a rational trier' of fact to reasonably conclude that all of the elements of second degree murder were proven beyond a reasonable doubt.

Isaac Green’s Testimony

In his pro se assignment of error, Neal argues that he was denied his Sixth Amendment right to confront and cross-examine witnesses when the trial court found Green’s, statement inadmissible due to his untimely death. Neal argues that had Green’s statement been admitted into evidence, he would have been able to establish that he was not in the immediate vicinity of the carwash at the time of the shooting.
After Detective Rash’s testimony for the defense, the defense sought to admit into evidence the videoed statement of Green, who was deceased at the time- of trial. The defense' argued that the statement would corroborate the story that had been told, establish that Green was at the carwash with Neal, confirm that Neal and Green came back several times to Carter’s home, and provide an alibi for Neal at the time of the shooting.
Green’s statement was provided to the defense by the state in response to discovery, and the defense requested that the entire statement be played for the jury. The state objected on the grounds of hearsay under La. C.E., art. |31804(b)(3) and argued that in order for .the statement to be admissible, the declarant must be unavailable.- and the statement must be against the declarant’s interest. The state argued,, that Green’s statement was not against his interest and was also not given under oath.
The trial court ruled that Green was not available as he was shot and killed prior to trial. However, the court found the statement not to be against Green’s interest under La. C.E. art. 804 (b)(3). Further, the court found the statement to be repetitive regarding who was present at the carwash and that as to the alibi, the state would be precluded from cross-examining Green. The defense objected to the ruling.
La. C.E. art. 804 provides in pertinent part as follows:- •
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant - is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. . This includes situations in.which the declarant:
*499 [[Image here]]
(4) Is unable to be present or testify at the hearing because of death or then existing physical or mental illness, infirmity,' or other sufficient cause;
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(3) Statement against interest. A statement which was at the time of its making so far contrary to the defendant’s pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declar-ant to criminal liability and offered to exculpate the accused is not admissible unless corroborating liarircumstances clearly indicate the trustworthiness of the statement.
Neal’s argument is without merit. Green’s statements merely corroborated other eyewitness testimony regarding the fact that an argument between Neal and Mitchell occurred before the shooting. The defense failed to show, that any alibi statement by Green would have been a statement against his interest. Ultimately, a large portion of Green’s statement was presented to the jury through the testimony of Detective Rash. Thus, this Court finds that the trial court was not erroneous in ruling that the statement was inadmissible.
CONCLUSION
For the foregoing reasons, we affirm the defendant’s conviction and sentence for the second degree murder of Lapatrick Mitchell.
AFFIRMED.

. Lapatrick- Mitchell was also known by the name "Turbo.”

. Through Detective Wilcher’s testimony; the following were introduced into evidence: a red t-shirt belonging to Neal; one pair of red, white, and blue plaid sleeping pants belonging to Neal; one projectile; 3 S&W caliber • spent cartridges; one white DNA box containing Neal’s DNA sample; one Colt 9mm sem-¡automatic and magazine collected off of the floorboard of the victim’s vehicle; and, one pair of red Reebok shoes worn by Neal at the time he was taken to jail.

. The search of the hotel room was pursuant to a search warrant.

. The three witnesses, Benjamin Reed and his wife, Jaliceea, and Justice Bowman, testified at trial.

. Yuck is Isaac Green.

. Neal testified that Green died in January of 2015.