COX, J.,
Anton Caron Cooley ("Cooley") was convicted by a unanimous jury of the second degree murder of Karen Johnson, in violation of La. R.S. 14:30.1. His motions for post-verdict judgment of acquittal and new trial were denied. Cooley was sentenced to life imprisonment without benefits. He now appeals. For the following reasons, Cooley's conviction and sentence are affirmed.
FACTS
Late in the evening of April 7, 2014, Yolanda Bailey, a resident in the victim's neighborhood, made a 911 call reporting a woman's scream and two gunshots in the vicinity of Valley View Drive in Shreveport, Louisiana. Ms. Bailey testified that she heard a woman's piercing scream, as if pleading for her life, followed by a gunshot. Ms. Bailey then called 911. After she hung up, she heard a second gunshot.
Responding officers found a deceased female under the carport of a residence on Valley View Drive. The woman was lying on her back with apparent gunshot wounds to the head. Medics determined that she was deceased and the coroner was notified. Several officers of the Shreveport Police Department testified about clearing and securing the scene, as well as gathering and photographing evidence. The officers' testimonies established that there was a black Mercedes vehicle parked askew in the front yard with the engine running. The contents of a woman's purse were scattered on the bed in the master bedroom. Among the contents was identification, which belonged to Karen Johnson. Karen's slippers were by the open door leading to the carport area.
The officers' testimonies also established that Karen's son arrived at the scene very distraught and provided them with the name "Tony," another name used by Cooley. Ballistics confirmed that shell casings found near Karen's feet were fired from the gun recovered during the investigation. It is not disputed that the gun belonged to Cooley and that he and Karen were together when she was killed. It is also not disputed that, after Karen was shot, Cooley left the scene in her vehicle, a white sedan. He ran the vehicle off a nearby *1164 road and got stuck in the mud in a field behind a residence. Police located the vehicle on the night of April 7 and had it towed to central storage.
The record indicates that the field where the white sedan was stuck was behind Jerome Cooley's ("Jerome") residence, a cousin of Cooley. Cooley went to Jerome's house and spoke with Jerome and his wife, Shelley. Jerome testified that he and Cooley were very close. He stated that when Cooley arrived, Cooley had a gun and told him that he thought he had "hurt her." Shelley testified that she heard Cooley say "that he thought he might kill her." Cooley asked Jerome to contact the police because he wanted to turn himself in and did not want to get hurt in the process. Jerome testified that he called Officer Mike Edwards, who was a friend of his and on the Shreveport Police force. Jerome and Shelley gave Cooley a cigarette (which Shelley testified had blood on the side of it), beer, and food.
Officer Edwards testified that he and Jerome Cooley were friends and in a trucking business together. He received a call from Jerome around 10:30 p.m. on April 7, asking him to come to Jerome's residence. When Officer Edwards arrived, he found an assault rifle on the cab of a small pickup truck. Officer Edwards testified that, as he retrieved the rifle, he heard a young man, whom he identified as Cooley, say "All she had to do was let go of the gun." Officer Edwards advised Jerome that he needed to take Cooley to the station and Jerome told Cooley to put down his cigarette and beer and go with the officer. Officer Edwards handcuffed Cooley and transported him to the police station. Pictures of the gun and Cooley's muddy pants were introduced and published to the jury during Officer Edwards' testimony.
Dr. Long Jin, an expert in forensic pathology, testified about the autopsy and stated that the cause of Karen's death was homicide; specifically, two gunshot wounds to the head. The first shot entered her temple area and the second shot was in the forehead. Dr. Jin testified that soot marks on the skin indicated that the barrel of the gun was touching the skin when fired. The temple shot was angled slightly from the front to the back and traveled left to right. There were no defensive wounds on Karen's body and no signs of struggle.
Corporal Tracy Mendels testified that she participated in the gathering and photographing of evidence at the scene. Particularly relevant to this appeal, Corp. Mendels observed oil and grit debris from the carport concrete on Karen's body and clothing. Corp. Mendels testified that this indicated that Karen was rolled or moved at some point before she was found.
Corporal Jennifer White testified that she recovered two cell phones from inside the residence. Corp. White also testified that, without manipulating the body, she noticed projectile fragments in the victim's hair. She stated that after Shreveport firemen cleaned the carport of biological matter, she noted and photographed two defects in the otherwise smooth slab of concrete. The defects were at least two inches wide and near where Karen's head had been. A third defect was found in the wall. Regarding the assault rifle that was later located, Corp. White observed hair and blood splatter on the rifle. Photographs of the defects and gun were introduced and published to the jury.
Ratish Upadhyay, the custodian of records for AT & T, testified regarding one of the cell phones that was recovered from the residence, a Samsung AT & T phone, which Mr. Upadhyay identified as a "go phone." The phone number, or subscriber information, for the phone was (318) 402-5844.
*1165 Mr. Upadhyay provided a detailed description of how finding subscriber information and locating a phone by cell signal is done. The subscriber information, a mobility usage report, and NELOS (Network Event Location Services) report were introduced into evidence for the AT & T phone during his testimony.
Lieutenant Shannon Mack testified next and was accepted by the court as an expert in forensic cell phone analysis. Lt. Mack testified that she completed a forensic download of the two cell phones in this investigation. The second cell phone was an off-brand, manufactured by Huawei. The telephone number assigned to that phone was (318) 990-8920. She testified that the Samsung phone's number was saved in the contacts of the Huawei phone as "Cooley Baby." After analyzing the data from the two phones, Lt. Mack testified that there were "32 call detail records" (texts and phone calls) between the phones from 6:00 a.m. to 8:29 p.m. on April 7, 2014. Specifically, she testified that there was a lot of activity between the phones during the early morning hours that day and the final contact between the phones was at 8:29 p.m. On cross-examination, Lt. Mack stated that the only phone she was asked to tie to the Valley View address was the Samsung AT & T phone and that phone's last location on April 7 was the Valley View location.
Briana Johnson, Karen's daughter, also testified. Briana was at her grandmother's home with Karen the afternoon and evening before the shooting. Briana testified that Karen received multiple calls on her cell phone, but she did not answer. Briana confirmed that Karen's cell phone number was (318) 990-8920 (the Huwae). Briana looked at the phone and saw that Cooley was the caller and Briana told her mother to answer the phone. Briana testified that Karen went into another room and answered the phone. Briana could not hear what was being said, but testified that her mother's tone was elevated. After the call, Karen stayed one or two minutes and then left. Briana testified that "eight or nine" minutes later, her phone started "blowing up" with calls about something happening to her mother. She went to her mother's home, but never saw her alive again.
In addition, the state presented the testimony of two of Cooley's former girlfriends. First, Tonya Williams testified that she and Cooley were in an "off and on" relationship for about seven years starting in 2005. Tonya explained that the two were living together in April 2008, and had a conversation one evening about ending the relationship, which made Cooley unhappy. The next morning, Cooley approached Tonya about having sex and she refused. He asked her to speak to him in the bedroom and Tonya again brought up ending the relationship. Tonya testified that Cooley grabbed her around her neck, choking her, and bit her hand, drawing blood. The two struggled and he straddled her back, with her on her hands and knees, and dug his fingers into her eye sockets. Tonya was screaming and her daughter, who was 11 years old, came into the room and left again to retrieve a weapon. Cooley continued gouging her eyes and forced her to lie down on her stomach, after which he hit her across the back of the head with a radio. At some point, Cooley left the residence and Tonya, whose eyes were bleeding, sought medical attention at the emergency room. Cooley was convicted and sentenced for this offense. The minutes were introduced into evidence. On cross-examination, Tonya conceded that the relationship resumed after Cooley was released from jail and the relationship ended in 2012.
Erica Simmons testified that she was in a relationship with Cooley in 2003 that *1166 lasted a year or less. When Erica decided to end the relationship, she stopped speaking with Cooley. Erica testified that on April 1, 2003, Cooley came to her place of employment, Lifeshare Blood Center, and watched her close. Erica asked a friend to walk with her to her car and Cooley followed. Erica told Cooley she did not want to talk to him, but Cooley calmly and persistently asked why she was ending the relationship with him. Erica responded that Cooley had thrown three of her phones in toilets and that he "knew what he had done." Erica testified that she then told him she had to pick up her kids and he got in the car with her. Cooley told her that he would ride with her and talk, and Tonya could bring him back to his car. She agreed. The two drove to the daycare and picked up Tonya's two children, ages one and three, and Tonya put them in car seats in the backseat. Erica testified that they continued to talk and Cooley fluctuated between being apologetic and loving and irate about her telling him it was over.
Erica went by her apartment complex to speak with the manager because, unbeknownst to Cooley, she was having the locks changed. Cooley remained in the car. After Erica spoke with the apartment manager and returned to the car, Cooley told her that he would pay for replacement phones and they went to Walmart. While checking out, Cooley refused to pay for the phones and the two argued. The children were in the store with them. Erica testified that when they got back to her car, Cooley began "sweet talking" again and apologized, saying that he did not have the money right now for the phones, but would pay her for them. Erica testified that she was angry and told him that she was going to leave him in the parking lot, but Cooley talked her into taking him to his car.
While Erica was driving, she continued to tell him it was over. Erica testified that Cooley became irate, hitting the dashboard and the steering wheel. Erica testified that she called her best friend to try to ignore Cooley, but Cooley yanked the steering wheel causing the car to move into the path of oncoming traffic. Erica testified that Cooley said, "I will kill all of us in this MF." As Erica tried to avoid hitting another car, Cooley said, "Bitch, the only way out of this relationship is to die out." The next thing Erica remembered was Cooley grabbing her cell phone and repeatedly punching her in the side of her face with it. Erica stated that there was blood everywhere and she remembered hearing her kids screaming and seeing blood splatter on their faces. Erica blacked out and regained consciousness at Willis Knighton hospital.
Erica has undergone two facial surgeries and a retinal detachment surgery as a result of the injuries inflicted by Cooley. She testified that the entire right side of her face is metal and she has headaches daily, for which she takes medication. Cooley was convicted of second degree battery for the offense against Erica. The minutes of that prosecution were introduced into evidence. The state rested at the conclusion of Erica Simmons' testimony.
After a very thorough discussion between the trial judge, Cooley, and Cooley's counsel, Cooley elected to testify and was the only witness for the defense. Cooley provided the following version of events.
On April 7, 2014, Cooley had decided to go to Texas to visit a second woman with whom he was romantically involved. Karen was aware of this other woman and was angry. While Cooley was at home (the residence on Valley View Drive) that evening packing for Texas, Karen came home and the two argued. Cooley testified that Karen "blew" and made "for a little old argument." He stated that Karen repeatedly *1167 told him to call that bitch and tell her he was not coming.
Cooley stated that he had the "AK" on the bed to pack to take with him and Karen reached for the gun. Cooley testified that the two "tussled" over the gun and he "used his body" to position himself to take the gun from her and he tossed it to the head of the bed. She reached for the gun again and Cooley grabbed the gun. Cooley testified that Karen then ran and blocked the bedroom door shouting at him to call the bitch and "tell her you ain't coming." Cooley turned his back to Karen and went through the doorway. Cooley stated that Karen was slapping him and trying to prevent him from leaving and he was trying to get outside.
Cooley testified that he told Karen, "I didn't stop you from where you was all day today, so you not going to stop me from where I'm going." Cooley intended to leave immediately, but could not find the car keys. Because he "got to get Karen out of the way," he slammed her up against the living room wall with his body and she fell. When she got up, Karen walked out of the house and he kept looking for the car keys. Cooley testified that, at that point, he decided he should not be in the house:
If I stay in this house with this woman here, I know what's fixin'-she ain't going to stop. Karen needed me to put my hands on her so she could tell police I beat her up. That's what she did. And I'm not giving her that.
Cooley stated that he could see Karen outside through a large window and she was standing with her arms folded and was "hot." Cooley took the clip out of the gun and went outside. Karen began yelling at him and snatched the gun from under his arm and began putting it together. The two then tussled for the gun and as Karen "laid there and she inserted the bullet into that chamber. I got on her. When I attacked her, I attacked the gun. I ain't putting my hands on her."
When asked about their positioning, Cooley stated that they were standing upright tussling when he tried to flip Karen and she ended up behind him and the gun went off. She fell and Cooley fell with her. Cooley testified that "I thought I heard like 'agh.' " I thought I heard in between two to three shots when I hit the ground." He did not see any blood, but did not see her moving. Cooley grabbed the gun and her car keys, because he maintained he could not find his keys, and he left in her car, the white sedan. Cooley testified that the black Mercedes was not running.
Cooley further testified that he left Valley View Drive and drove around in disbelief and contemplated suicide. Because he felt that he had to get Karen "some help," Cooley went to Jerome's house and told Jerome to call the police. According to Cooley, he told Jerome, "Karen tried - we laid there until we started wrestling and fighting for the gun, man. And Karen done got hurt .... I think Karen is hurt ... I need you to call the police." Cooley then wanted Jerome to call the news so that "the news can watch the police for these dudes [the police] won't try to kill me." Cooley testified that Jerome went inside the house and, shortly thereafter, Officer Mike Edwards arrived, handcuffed him and took him to jail.
Cooley testified that he ate three plates of turkey necks and rice and drank two or three beers at Jerome's house. He was there for about an hour. He also testified that he did not intend to hurt Karen, saying, "Karen is beautiful. Karen is sweet. You ain't fixin to hurt Karen."
When asked about his criminal history on cross-examination, Cooley was adamant that he is not a "woman beater." He explained that the problem with the women *1168 he dated was that they could not keep him from cheating on them because he is "slim" and "handsome." Cooley confirmed that his cell phone number was (318) 402-5844 (the Samsung). Cooley also denied that any witness heard Karen scream for her life. The defense rested at the conclusion of Cooley's testimony.
The jury found Cooley guilty as charged and he was sentenced to the mandatory term of life in prison without benefits. This appeal ensued. Cooley's counsel filed a brief on appeal and Cooley filed a pro se brief, in which he requested that the appellate record be supplemented. The record was subsequently supplemented with the hearing transcript of June 26, 2016. Counsel for Cooley, the state, and Cooley, pro se , filed supplemental briefs relating to that transcript.
DISCUSSION
Insufficient Evidence and Post-Trial Motions
In his first and second pro se assignments of error, Cooley argues there was insufficient evidence and the trial judge erred in the denial of post-trial motion for post-verdict judgment of acquittal and motion for new trial. In his post-verdict motions, he argued insufficient evidence for a finding of guilty. Cooley challenges only the manner in which Karen was shot, maintaining that she was shot accidentally while she and Cooley were tussling over a semi-automatic gun.
When issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed. 2d 30 (1981) ; Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979) ; State v. Dennis , 46,471 (La. App. 2 Cir. 9/21/11), 72 So.3d 968, writ denied , 2011-2365 (La. 5/18/12), 89 So.3d 1189.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson, supra ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed. 2d 248 (2004) ; State v. Neal , 51,574 (La. App. 2 Cir. 5/2/17), 219 So.3d 482. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. Neal, supra.
An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983) ; State v. Freeman , 50,282 (La. App. 2 Cir. 4/13/16), 194 So.3d 1, writ denied , 2016-0927 (La. 5/1/17), 220 So.3d 743.
Where there is conflicting testimony about factual matters, the resolution *1169 of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed. 2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Bass, 51,411 (La. App. 2 Cir. 6/21/17), 223 So.3d 1242, writ not considered , 2018-0296 (La. 4/16/18), 239 So.3d 830. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. State v. Bass , supra . A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 2009-0725 (La. 12/11/09), 23 So.3d 913.
The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed. 2d 62 (2000) ; State v. Hicks, 51,272 (La. App. 2 Cir. 5/17/17), 222 So.3d 91.
The state produced sufficient evidence to support the jury's verdict of guilty of second degree murder. The only evidence presented by the defense was the self-serving testimony of Cooley, in which he paints a picture of a jealous girlfriend who became enraged at the idea that Cooley was going to see another woman. The argument turned deadly when Karen repeatedly tried to gain control of Cooley's semi-automatic rifle, which accidentally fired when Cooley was trying to wrestle the gun from Karen. The jury reasonably discredited this testimony when compared with the testimony of Ms. Bailey that she heard a piercing scream and then two gunshots, coupled with the uncontradicted evidence that Karen was shot once in the temple and once in the forehead with the barrel of the gun touching her skin. As evidenced by the defects in the otherwise smooth concrete floor of the carport, Karen was lying down when shot. The defects were located where Karen's head was positioned when she was found.
The jury also credited the testimony of Karen's daughter, Briana, who stated that Karen had an "elevated" tone while talking to Cooley minutes before the shooting and that Cooley had been calling Karen repeatedly that evening. The jury also heard testimony from Tonya and Erica, two former girlfriends, who both testified about their violent encounters with Cooley when they tried to end relationships with him. The jury made a credibility determination not to believe Cooley's testimony, which will not be disturbed on appeal.
These assignments of error lack merit.
Motion to Dismiss/Quash
Cooley's counsel argues that the trial court erred in denying his motion to dismiss/quash because there is no proof in the record that the grand jury indictment was returned in open court. In his pro se assignment, Cooley makes the same argument, but concedes that his motion to dismiss/quash was not on the basis of any defect in the indictment. Contrary to defense counsel's assertion, the only motions to dismiss and quash were filed pro se on October 7, 2015. These were separate motions *1170 filed on the same day and only asserted lack of subject matter jurisdiction (motion to dismiss) and failure to provide a speedy trial (motion to quash). Both motions were denied on June 27, 2016.
The motion to quash is essentially a mechanism by which to raise pre-trial pleas of defense, i.e., those matters which do not go to the merits of the charge. State v. Jones , 50,270 (La. App. 2 Cir. 2/10/16), 188 So.3d 268, 276, writ denied , 16-0858 (La. 5/1/17), 220 So.3d 742.
La. C. Cr. P. arts. 532 and 533, which set forth the grounds for a motion to quash, do not include the failure to return the indictment in open court. However, such lists are merely illustrative, and motions not based on the grounds listed therein should not be automatically denied. In making the determination of whether a given issue is appropriate to raise in a motion to quash, a court should determine whether it is a defense which, if successful, requires dismissal of the indictment, regardless of the merits of the charge and which by its nature must be available before trial. State v. Jones, supra .
La. C. Cr. P. art. 383 provides:
An indictment is a written accusation of crime made by a grand jury. It must be concurred in by not less than nine of the grand jurors, indorsed "a true bill," and the indorsement must be signed by the foreman. Indictments shall be returned into the district court in open court; but when an indictment has been returned for an offense which is within the trial jurisdiction of another court in the parish, the indictment may be transferred to that court.
An irregularity or error cannot be availed of after the verdict unless it was objected to at the time of its occurrence. La. C. Cr. P. art. 841.
Cooley waived his right to object to the alleged defect in the indictment by failing to file a motion to quash raising the issue prior to conviction. Appellate defense counsel erroneously asserts that Cooley filed a motion to quash within days of arraignment. Cooley concedes in his pro se brief that his motion to quash, which was not filed until October 7, 2015, was not based on the indictment.
Even if it had been timely raised, the minutes indicate that a true bill was filed on May 5, 2015. The minutes entered are only of what is done while court is in session, thus, a minute entry that a true bill was filed indicates that a true bill was returned in open court. See State v. Jones , 14-0014 (La. App. 4 Cir. 6/11/14), 144 So.3d 120, writ denied , 14-1496 (La. 2/27/15), 159 So.3d 1065.
These assignments of error lack merit.
Prior Bad Acts and Crimes
The state filed a notice of intent to introduce the evidence of the prior violent encounters with Tonya Williams and Erica Simmons, and the court conducted a 404(B) hearing on October 26, 2016. Tonya and Erica testified similarly to their trial testimony as described above. Defense counsel argued that the acts were far removed from the instant offense, did not involve guns, and did not show any of the accepted bases for admission.
The state argued that the incidents showed motive, opportunity, intent, and absence of mistake of fact. The state urged that the prior acts showed Cooley's propensity to become violent when a woman stated she wanted to end a relationship. In addition, the state argued that the incidents showed modus operandi , in that when Cooley does not get his way, he reacts with violence toward the woman. On appeal, Cooley's counsel continues the arguments from below, urging that the admission of the evidence was highly prejudicial *1171 and such prejudice outweighed any probative value the evidence may have had.
Following argument, the trial judge cited State v. Rose , 06-0402 (La. 2/22/07), 949 So.2d 1236, finding that past instances of domestic abuse violence are admissible. The trial judge ruled that the acts that formed the basis of the two convictions, which were by guilty plea, would be admissible. Because he believed some of the testimony adduced at the hearing would exceed the scope of what should be allowed, the trial judge stated that he would fashion a ruling that could serve as a "blueprint" to ensure that extraneous and prejudicial acts that did not form a basis for conviction would not be admitted. In a written ruling of April 13, 2017, the scope of the women's testimonies was limited to the acts surrounding the attacks and the victims' injuries, along with the nature of the relationships with the defendant, including his attitude toward the women. State v. Rose, supra .
La. C.E. art. 404(B)(1) provides:
Except as otherwise provided in La. C.E. art. 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. art. 404(B) ; State v. Jackson , 625 So.2d 146 (La. 1993) ; State v. Berry , 51,213 (La. App. 2 Cir. 5/17/17), 221 So.3d 967. This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his unrelated criminal acts. State v. Prieur , 277 So.2d 126 (La. 1973).
However, the state may introduce such evidence if it establishes an independent and relevant reason, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The state must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. State v. Prieur , supra .
Even when other crimes evidence is offered for a purpose allowed by La. C.E. art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. State v. Rose, supra . The state also bears the burden of proving that the defendant committed the other crimes, wrongs, or acts. State v. Galliano , 02-2849 (La. 1/10/03), 839 So.2d 932.
Although a defendant's prior bad acts may be relevant and otherwise admissible under Article 404(B), the court still must balance the probative value of the evidence against its prejudicial effects before it can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is probative to a high degree. State v. Germain , 433 So.2d 110 (La. 1983). "Prejudicial," in this context, means that probative evidence of prior misconduct is excluded only *1172 when it is unduly and unfairly prejudicial. Old Chief v. United States , 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed. 2d 574 (1997) ; State v. Germain, supra.
In State v. Howard , 47,495 (La. App. 2 Cir. 11/14/12), 106 So.3d 1038, this Court relied on State v. Rose, supra , in allowing evidence that Howard had shown a deviant attitude toward other women he had dated and to negate any claim that Howard intended only to frighten his victim. The Howard court explained:
In State v. Rose, supra , the supreme court explicitly approved the admission of the defendant's acts of violence against (and killing of) his first wife, at the trial for the murder of his second wife. The court found the prior acts clearly expressed the vicious, deviant attitude the defendant held toward women with whom he had a romantic relationship, such that the crimes were "inextricably connected in the pattern" they exhibited. Id. at 16-17, 949 So.2d at 1245-1246. Although the precise issue in Rose was the identity of the murderer, and although the other crimes evidence loomed large because the state's case was mainly circumstantial, the court fully approved admission of the other crimes evidence to prove "a specific pattern of violent and obsessive behavior [which] earmarked the crimes as the work of one man[.]"
The erroneous admission of other crimes evidence is subject to the harmless error analysis on appeal. Such error is harmless where the verdict rendered is "surely unattributable to the error." State v. Small , 50,388 (La. App. 2 Cir. 2/24/16), 189 So.3d 1129, writ denied , 2016-0533 (La. 3/13/17), 212 So.3d 1158.
The inquiry is whether the evidence was relevant to serve some independent purpose apart from showing Cooley was merely a bad person. While the weapon was different, and the first two victims were not killed, Cooley's past violent behavior against women when they attempted to end a relationship is particularly relevant to his opportunity, plan, motive, modus operandi , intent, and absence of mistake. Cooley has shown a pattern of rage and physical abuse to women he is dating when the women stop accepting his phone calls and distance themselves from him. Tonya and Erica both sustained serious injuries at the hands of an enraged Cooley. His weapon of choice and the fact that Karen was killed do not make the prior attacks on Tonya and Erica irrelevant. The trial court did not abuse its discretion in allowing this evidence.
This assignment of error lacks merit.
Motion for Speedy Trial
Cooley argues pro se that the trial judge erred in denying his motion for speedy trial. On May 27, 2014, Cooley filed a pro se motion for speedy trial. Cooley's counsel elected not to adopt this motion because it was filed before discovery and was not in compliance with La. C. Cr. P. art. 701.[1] In the hearing on June 27, 2016, defense counsel explained why she did not adopt the pro se motion filed in 2014 and advised the trial court that she had provided Cooley with another motion for speedy trial in May 2016, after discovery had been *1173 had, and advised him that if he wanted to sign the motion, she would also sign it and file it. Cooley never signed the May 2016 motion for speedy trial. At the conclusion of the hearing, the trial court denied all pending pro se motions, which included the May 27, 2014 pro se motion for speedy trial.
A motion by the defendant for a speedy trial, in order to be valid, must be accompanied by an affidavit from the defendant's attorney, certifying that he is prepared to proceed to trial. La. C. Cr. P. art. 701(D)(1). However, if the affidavit from the attorney is not attached to the motion for a speedy trial, then the matter must be set for a contradictory hearing within 30 days. La. C. Cr. P. art. 701(F).
La. C. Cr. P. art. 701 provides that the sole remedy for failure to commence trial within the mandated time period is pre-trial release without bail. Once a defendant has been convicted, any allegation that La. C. Cr. P. art. 701 has been violated becomes moot. State v. Nixon , 51,319 (La. App. 2 Cir. 5/19/17), 222 So.3d 123, writ denied , 2017-0966 (La. 4/27/18), 239 So.3d 836.
The trial court did not err in denying the pro se motion for speedy trial. As defense counsel pointed out to the trial court, the motion was filed well before discovery had even begun and was noncompliant with La. C. Cr. P. art. 701. In addition, when defense counsel provided a timely motion for Cooley to sign, he elected not to do so. Finally, any issue regarding a speedy trial is now moot, since Cooley has been convicted.
This assignment of error lacks merit.
Ineffective Assistance of Counsel
Cooley argues that his appellate counsel was ineffective because the record on appeal was incomplete and did not allow her to conduct a thorough review.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court rather than by appeal. This is because post-conviction relief creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. State v. Nixon, supra .
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. Under the standard set out in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), and adopted by the Louisiana Supreme Court in State v. Washington , 491 So.2d 1337 (La. 1986), a conviction must be reversed if the petitioner proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced the defendant to the extent that the trial was rendered unfair and the verdict suspect. State v. Legrand , 02-1462 (La. 12/3/03), 864 So.2d 89, cert. denied , 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed. 2d 523 (2005) ; State (City of Ruston) v. Campos , 51,447 (La. App. 2 Cir. 6/21/17), 224 So.3d 480.
A deficient performance is established by showing that the attorney's actions fell below the standard of reasonableness and competency required for attorneys in criminal cases and is evaluated from the attorney's perspective at the time of the occurrence. Strickland v. Washington, supra . A reviewing court must give great deference to the trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment.
*1174 State v. Nixon, supra . A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland v. Washington, supra ; State v. Nixon, supra .
A defendant is entitled to a complete record on appeal and, as previously noted, this appeal record was supplemented on Cooley's request. Following supplementation, defense counsel filed a supplemental brief assigning an additional assignment of error, requesting that the record be reviewed for errors patent. Cooley has provided this Court with no support for his assertion that the record is, in fact, incomplete or that his appellate counsel failed to conduct a thorough review of the record.
This assignment of error lacks merit.
Motion to Suppress
Cooley argues pro se that the trial court erred in denying his motion to suppress. On May 27, 2014, Cooley filed a pro se motion to suppress alleging only that "that evidence to be used against the defendant herein has been unlawfully and illegally obtained and that the defendant moves that this evidence be suppressed." In the hearing on June 27, 2016, defense counsel advised the trial court that she did not adopt that motion because discovery had not yet occurred and because the motion failed to state the legal basis for suppression or what evidence Cooley was seeking to have suppressed. The trial court denied the motion.
A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. C. Cr. P. art. 703(A). An evidentiary hearing on a motion to suppress shall be held only when the defendant alleges facts that would require the granting of relief. La. C. Cr. P. art. 703(E). Vague and general legal conclusions, urged in form motions, are inadequate to require the holding of such a hearing. State v. Giordano , 284 So.2d 880 (La. 1973) ; State v. Edens , 465 So.2d 954 (La. App. 2 Cir. 1985), writ denied , 467 So.2d 538 (La. 1985).
A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion. State v. Thompson , 11-0915 (La. 5/8/12), 93 So.3d 553 ; State v. Nelson , 51,009 (La. App. 2 Cir. 2/1/17), 215 So.3d 389.
Clearly, Cooley's motion to suppress fails to state a basis for suppression of evidence. The evidence sought to be suppressed was not identified, likely because discovery had not yet occurred. In addition, there was no legal basis stated for suppression of any such evidence.
This assignment of error lacks merit.
Removal of Representation
Cooley argues pro se the trial court erred in refusing to remove Mary Harried as his representation. On June 27, 2016, Cooley filed with the district court a letter requesting the removal of his appointed attorney Harried. In the request, Cooley stated that he was pursuing a lawsuit against Harried and the "Public Defenders Board." Cooley alleged that he and Harried did not get along, that "she gave my statements to the detective," and that he wanted his cell phone introduced into evidence. He further stated that Harried had violated his constitutional rights.
At the June 27, 2016 hearing, Harried outlined her representation of Cooley and detailed all of the work that she had done on the case. The trial court noted his experience with Harried as thorough and competent. Treating the letter from Cooley as a motion to relieve Harried as his counsel, the trial court denied the motion.
The Sixth Amendment to the U.S. Constitution, as well as *1175 La. Const. art. I, § 13, guarantee the accused in a criminal proceeding the right to assistance of counsel for his defense. Gideon v. Wainwright , 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963). As a general proposition, an accused person has the right to counsel of his choice. State v. Leggett , 363 So.2d 434 (La. 1978) ; State v. Kennon , 50,511 (La. App. 2 Cir. 4/13/16), 194 So.3d 661, writ denied , 16-0947 (La. 5/19/17), 220 So.3d 747. However, that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. State v. Jones , 376 So.2d 125 (La. 1979) ; State v. Leggett, supra ; State v. Kennon, supra .
If a defendant is indigent, he has the right to court-appointed counsel; however, an indigent defendant does not have the right to have a particular attorney appointed to represent him. State v. Harper , 381 So.2d 468 (La. 1980) ; State v. Bell , 51,312 (La. App. 2 Cir. 5/17/17), 222 So.3d 79. A criminal defendant who has been appointed counsel has no right under the Sixth Amendment to the counsel of his choice. State v. Reeves , 06-2419 (La. 5/5/09), 11 So.3d 1031, cert. denied , 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed. 2d 490 (2009).
Cooley failed to articulate any basis for removal of appointed counsel. A review of the entire proceedings reveals thorough and competent representation of Cooley by Attorney Harried. This assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of the defendant, Anton Caron Cooley, is affirmed.
AFFIRMED.

The trial judge initially stated that he did not have to rule on pro se motions filed by defendants who were represented by counsel. In a writ disposition, this Court instructed the trial court that it did, in fact, have to rule on pro se motions absent a finding that doing so would lead to confusion at trial. See No. 50,713 KH, citing State v. Melon , 95-2209 (La. 9/22/95), 660 So.2d 466. Pertinent to this appeal, the pro se motion for speedy trial and the pro se motion to suppress, both filed on May 27, 2014, were denied following the hearing on June 27, 2016, following that writ order.