COX, J.
This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Following a bench trial, the defendant, Robert Stuart Douglas, was found guilty as charged of attempted armed robbery. Douglas was sentenced to serve 12 years' imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. Douglas now appeals his conviction.[1] For the following reasons, Douglas' conviction and sentence are affirmed.
FACTS
On November 10, 2010, Douglas and James Micah Vanhorn were charged with the attempted armed robbery of Jordan Willis, committed on October 27, 2010, in violation of La. R.S. 14:64 and La. R.S. 14:27. Both defendants were tried together and both defendants were represented by the same attorney.[2]
Sergeant Tim Adgate, of the Shreveport Police Department, testified that on October 27, 2010, he was the first responder to a 911 call for a home invasion at 9307 Wiscassett Drive in Shreveport, Louisiana. Sgt. Adgate found a white male, with duct tape around his wrists and ankles, holding a 12-gauge shotgun and standing over another male, who was covered in blood and lying face down on the ground. A third male, with blood running down his face, was also on the ground to the side of the first two men. The man with the gun and the man with blood on his face repeatedly asked the man lying on the ground, "Why?" Sgt. Adgate secured the shotgun and identified the holder as Jordan Willis, who lived in the Wiscassett Drive home owned by his father, James Willis. Sgt. Adgate identified the man with blood running down his face as Jordan's brother, Dillon Willis. Sgt. Adgate testified that Jordan told him that the man lying on the ground was one of two men who "busted in" their house, identified themselves as narcotics officers, and then wrapped Jordan's and James' wrists, feet, and head in duct tape. Sgt. Adgate later learned that the man lying on the ground was Vanhorn.
Shreveport Police Detective John Jackson, who also responded to the 911 call, *375 testified that James had duct tape on his wrists and ankles and that he had scratches and bruises. Det. Jackson testified that James told him the following:
• He answered a knock at the door and two men identified themselves as narcotics officers and forced their way inside.
• The intruders told him that they were there on a marijuana complaint and asked if anyone else was present.
• He told them his son, Jordan, was upstairs.
• One man proceeded up the stairs to get Jordan, and the other man began binding him with duct tape.
• After Jordan was brought downstairs, the intruders began binding Jordan with duct tape too.
• His other son, Dillon, arrived at the house, and one of the men used a black, semiautomatic handgun to strike Dillon.
• He and his sons realized the men were not law enforcement officers and fought back.
• As Dillon struggled with the man with the gun, Jordan broke loose from the duct tape and retrieved a shotgun.
• When Jordan fired the shotgun, the man with the gun ran outside and drove off in a white car.
• He, Dillon, and Jordan were able to catch the other man, and restrain him until police arrived.
Shreveport Police Detective Shawn Parker also responded to the home invasion call and testified about statements he took from Jordan and Dillon. He testified that both of them were in shock. Det. Parker testified that Jordan told him the following:
• He was asleep in bed when a white man wearing sunglasses and a hat woke him up and dragged him downstairs to the kitchen, where another larger white man was binding his dad with duct tape.
• The intruders wrapped his and his dad's wrists and feet, and then their heads with duct tape.
• When he heard his brother Dillon walk in, he asked Dillon if he saw any badges on the intruders.
• When Dillon said he did not see any badges, Jordan struggled loose from the duct tape, retrieved a shotgun, and fired it into the living room.
• When he fired the shotgun, the bigger man ran out of the house and drove off in a white vehicle, but Dillon and James caught the other man.
• He, his dad, and his brother struggled with the other man, and he struck the man on the back of the head with the butt of the shotgun.
Det. Parker testified that Jordan still had duct tape around his wrists and ankles and that residue from the tape remained around his eyes, indicating where the tape had been. Det. Parker testified that he believed Jordan was in shock because Jordan appeared very emotional, his hands were shaking, he voice was broken, and he was pacing back and forth.
Det. Parker testified that Dillon told him the following:
• In an earlier phone conversation, he told his dad that he would stop by the house.
• When he arrived, he saw a white Toyota parked in the driveway and thought painters were at the house as part of some recent renovations.
• After he entered the house, he found his dad and his brother with duct tape wrapped around their heads.
*376 • A large white man with a gun grabbed him and threw him against the wall, pistol-whipped him with a black, semiautomatic handgun, and began choking him.
• He was blacking out when he heard the shotgun fire and the man suddenly ran off.
• The other man attempted to follow, but he tripped that man as he crossed through the door and then struck him in the head with a brick.
Det. Parker testified that the fire department had Dillon transported to the hospital to be treated for injuries and shock.
Shreveport Police Sergeant Tawanna White also responded to the home invasion call. Sgt. White testified that Vanhorn was placed in custody, but he was bleeding from a head injury so he was transported to a nearby hospital for treatment. She described Vanhorn as a tall, thin, white male. She testified that Vanhorn initially identified himself as "Shawn." She testified that after she read Vanhorn his Miranda rights, he gave her his real name, identified his accomplice as Robert Stuart Douglas, and said Douglas drove a white Toyota Camry. Sgt. White testified that Vanhorn told her that Jordan Willis owed him $ 500, and when he went to collect the money, the Willis family beat him up. She stated that Vanhorn insisted he was not armed.
Shreveport Police Officer Joshua Mayfield testified that he found Douglas at his Shreveport home and Douglas' white Toyota Avalon was parked outside the home. Officer Mayfield testified that Douglas told him that he and Vanhorn had coffee that morning and discussed putting out deer corn, then Vanhorn left. Officer Mayfield testified that Douglas initially denied having any firearms other than a shotgun, but later admitted that there was a 9 mm handgun on a shelf in his laundry room.
Det. Jackson testified that a search of the shelves in Douglas' laundry room revealed a black canvas bag containing a black semiautomatic handgun with five magazines, each loaded with 9 mm ammunition. He testified that the bag also contained a pocket knife with "Vanhorn" scratched on it, a business card with Micah Vanhorn's name, and a second folding pocket knife. Det. Jackson testified that a roll of duct tape was found in the trunk of Douglas' vehicle.
Det. Parker testified about his interview with Vanhorn, in which Vanhorn made the following statements:
• He went to the Willis home to collect $ 500 that he had loaned to Jordan Willis, because he heard Jordan was using the money to buy marijuana.
• He brought Douglas with him to act as a deterrent because he believed the Willis family was violent.
• He brought the duct tape to tie Jordan up while he searched for the money, but denied having a gun.
• When James answered the door, Vanhorn asked for Jordan, and James replied that Jordan was upstairs and began to shut the door.
• He forced the door open and demanded to see Jordan. At that point, the family "jumped him," resulting in a fight, and the family beat him up.
Det. Parker testified that Douglas' Toyota Avalon matched the description of the white vehicle that Dillon said was parked in his father's driveway and that the Willis family members said the larger intruder used to drive away. Det. Parker testified that during the search of Douglas' home, officers found clothing in the bedroom with suspected blood on it.
James testified that on October 27, 2010, he answered a knock at the door and *377 two white men, identifying themselves as police officers, pushed the door in, announcing that he was under arrest. James testified that one man was smaller than the other and wore a hat with a star on it. The other man was larger and wore a holstered gun on his hip. James testified that the men grabbed him, spun him around, shoved him against the wall, and pinned his arms behind his back. He stated that the men asked him if anyone else was home, and he told them that Jordan was upstairs. James testified that after bringing Jordan downstairs, the two men used duct tape to bind his and Jordan's hands behind their backs.
James testified that after the men bound their hands, he heard his older son, Dillon, come inside the house calling for him. He stated that when Dillon walked in the kitchen and saw them bound with duct tape, Dillon cursed loudly. James testified that he believed these two men were law enforcement officers and he told Dillon to calm down. He stated that he heard one of the men say that he was under arrest and then heard scuffling and fighting. James said he heard Jordan ask Dillon if the men had badges. James testified that Dillon replied, "no," so he fought to pop the duct tape from his hands and remove the tape from his eyes. He stated that he saw his son Dillon fighting with one of the men, while Jordan had gotten loose and returned with a shotgun. James testified that he told Jordan not to shoot the men. James testified that when Jordan fired the shotgun, the bigger man ran out and drove off in a white vehicle. James testified that he called 911.
James denied dealing drugs in the house. He further testified that he was retired and drew social security disability.
Jordan testified that he had a 2004 conviction for disturbing the peace and admitted that he had half of a gram of marijuana in his room that day. Jordan testified that a skinny guy wearing a baseball cap and shades woke him up and told him that he was under arrest. He stated that when the man saw the marijuana, the man said, "Now you've really got it, son." Jordan testified that the man pinned his arms behind him, marched him down the stairs, and began binding him and his dad with duct tape. Jordan testified that the men bound their hands and feet and wrapped duct tape around their heads, covering their faces. Jordan stated that they were wrapped like mummies and essentially "hog-tied."
Jordan testified that when he heard his brother shout upon seeing him and his dad wrapped in duct tape, he realized that these men probably were not law enforcement officers. He stated that he heard his brother scuffling with the two men and asked Dillon if he saw a badge on either man. Jordan testified that when Dillon replied, "no," he began twisting the duct tape until he could pop it off. He stated that he removed the tape from his face before running upstairs to retrieve his shotgun. Jordan testified that he yelled out loud and fired a warning shot from the top of the stairs down into the living room, striking his grandmother's rocking chair.
Jordan testified that after he fired the shot, the larger man suddenly ran off, while the skinny man was caught by the legs by Dillon at the door. Both stated that the skinny man was dragging Dillon along, still attempting to exit the house. He testified that he ran up and swung the shotgun like a bat, striking the man in the head. Jordan stated that this caused the man to collapse on the ground, and they all began fighting him. Jordan testified that Dillon struck the man with a brick, and he continued to strike the man in the head with the shotgun, but the man continued fighting them. Jordan stated that he called 911, *378 gave his address, advised there was a home invasion, and then returned to fighting the man.
Jordan denied knowing either of the intruders, owing either of them money, or selling drugs. Jordan testified that he identified Vanhorn in a lineup, but he did not get a good look at the larger man and was unable to identify him.
Dillon testified that he called his dad that morning about getting a loan approved and told him that he would stop by his house. He stated that when he arrived, he thought the white car parked in the driveway belonged to painters and he walked inside and called out for his dad. He testified that a man wearing a hat with a star on it appeared, identified himself as police, and told Dillon he was under arrest. Dillon stated that at the time, he thought the man might be a "vice" cop because he was dressed in plain clothes and not a police uniform. He stated that the man pinned his hands against the wall and he heard his dad tell him not to resist. Dillon testified that he saw a second man with a gun and his dad's head wrapped in duct tape. He stated that his brother, Jordan, then yelled out, asking if the men were cops.
Dillon testified that when he saw the duct tape on his dad's head, he knew the men were not cops, and he began fighting the men. Dillon testified that the man with the gun came up and struck him in the face with the pistol. He described the gun as a black, semiautomatic, maybe 9 mm handgun. Dillon testified that the smaller man dropped down and held his feet as the larger man continued to pistol-whip him in the head. He stated that one of the men then proceeded to choke him. Dillon testified that he was blacking out when he heard a shotgun being fired. He testified that the larger man let go of him and scrambled out of the front door. He said that the other man tried to follow, but he tripped him, and as the man fell, he grabbed the man's ankles and held on as the man began dragging him out the front door.
Dillon testified that the larger man drove off in the car as he continued fighting with the other man on the porch. Dillon stated that Jordan appeared and struck the man in the head with the shotgun and he grabbed a nearby brick and struck the man in the head. Dillon denied knowledge of any drug sales in the house or by Jordan. Dillon denied knowing either defendant or ever hunting with Vanhorn. He testified that he only hunts with his dad, James.
Shreveport Crime Scene Investigator Hannah Clark testified about the pictures that she took and the evidence that she collected that day at the Willis home. She stated a blue shirt with a bloodstain and another bloody shirt were found in the driveway. Officer Clark identified the photographs that she took of James and Jordan, showing the silver duct tape on their wrists and ankles. She stated that the silver duct tape was recovered from the wrists and ankles of James and Jordan. She stated that the frame of a pair of sunglasses with one lens, and a black baseball hat with a star and "U.S. Army" on it were found on the ground just outside the front door. She said the other lens was found separately outside. Officer Clark testified that she took several pictures of what was suspected to be blood. She testified that a rocking chair in the living room had holes in it that appeared to be bullet holes. Officer Clark stated that she recovered 12-gauge shotgun shells and a spent shotgun shell from the living room.
Officer Clark also testified about evidence recovered by Det. Parker at the Douglas residence: a pair of denim jeans and a white shirt with suspected blood.
*379 She testified that the shotgun used by Jordan and the semi-automatic handgun recovered from Douglas' house were taken as evidence.
After the state rested, the defense began its case in chief. Tommy Blunt testified that Vanhorn was an acquaintance and he hunted with Vanhorn on his land, but that Dillon was never with them. Blunt denied that Douglas had ever hunted on Blunt's land with Blunt.
Jennifer Vanhorn testified that in 2010, she was married to James Micah Vanhorn. She testified that she was interviewed by Det. Parker regarding the 2010 attempted armed robbery. Jennifer stated that she thought her husband left around 9 a.m. that morning to prepare a hunting spot. She testified that she told Det. Parker that she thought her husband's gun and holster were on top of the refrigerator in their home. Jennifer stated that when she checked, the holster was there, but the gun was gone. She testified that her husband had been adjusting to life outside the military. She stated that someone had owed her husband about $ 8,000 for work done by his roof contracting company, and they were behind on their mortgage, but they were expecting an insurance settlement payment of about $ 20,000. Jennifer testified that she knew Tommy Blunt and his wife, Shaindel Willis, and she knew of Shaindel's brother, Dillon, but had never met him. She testified that her husband knew Dillon Willis and that her husband smoked marijuana that he obtained from Jordan Willis. Jennifer insisted that her husband had been hunting with Tommy Blunt and Dillon Willis just two weeks before the offense, but she acknowledged that she had never met either of the Willis brothers. The defense then rested its case.
The trial court stated that it had carefully reviewed the witness testimony, exhibits, and the arguments of counsel. The trial court noted the officers' testimonies that Vanhorn admitted that he and Douglas purposefully went to the Willis home with the intention to take money from Jordan Willis by use of force, and that they planned to bind him with duct tape while they searched for the money. The trial court found that this evidence established the defendants' specific intent to take something from another by use of force and intimidation. The trial court found that the testimony of James, Jordan, and Dillon Willis was corroborated by the physical evidence recovered at the scene and established that the defendants committed attempted armed robbery with a firearm.
Citing State v. Jackson , 09-2406 (La. 1/19/11), 55 So.3d 767, the trial court found that, even assuming the existence of a debt, the debt was not a justification for taking the funds from Jordan Willis or for the defendants' actions. The trial court found that the State proved beyond a reasonable doubt that both Vanhorn and Douglas were guilty of attempted armed robbery.
The parties appeared for sentencing on February 8, 2018. The trial court stated that it had reviewed the presentence investigation reports for both Douglas and Vanhorn, as well as the letters from the victims and the letters submitted on behalf of the defendants. The letters submitted by Jordan, Dillon, and James Willis described the terror that they endured that day during the home invasion and the troubles they have endured since then in coping with the trauma. Numerous people submitted letters on behalf of Vanhorn, and his attorney provided documentation of his military service reviews.
The trial court stated that attempted armed robbery is considered a crime of violence, and at the time, the offense carried a sentencing range of 0-49½ years of *380 imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. The trial court stated that it considered both defendants to have acted in concert with each other, as principals, during the commission of the crime, even though Vanhorn acted as more the leader and only Douglas carried a gun.
The trial court reviewed the aggravating and mitigating factors of this case under the sentencing guidelines provided in La. C. Cr. P. art. 894.1. The trial court found that the defendants manifested deliberate cruelty by using the duct tape to bind James' and Jordan's hands and feet and to cover their faces. The trial court found that the defendants used actual violence, created a risk of death and great bodily harm, and caused significant psychological injury because the trauma of this "home invasion-styled robbery violated the sanctity of the home, which is not easily restored." The trial court further noted that there was also some physical injury, notably where Douglas used a firearm to pistol-whip Dillon. The trial court found that Vanhorn had acted as more the leader in the commission of the offense.
The trial court found that the circumstances did not support a claim of provocation, inducement, or facilitation by the victims, because there was no evidence to substantiate the claim that Jordan owed Vanhorn a debt, and Jordan consistently denied any involvement with Vanhorn or Douglas. The trial court further stated that even if a debt had existed, the debt did not warrant or justify the home invasion.
As mitigating factors, the trial court noted that the defendants did not kill or cripple anyone and did not discharge a firearm during the commission of the offense. The trial court also concluded that the evidence did not indicate that the defendants intended to murder the victims. Further considering each defendant's personal history, the trial court noted that Douglas had been a productive member of society, had been consistently employed, had provided for his family, and had no troubling criminal history. The trial court noted that Vanhorn had an exemplary service record with multiple citations for service, at great personal risk to himself. The trial court found that Vanhorn's military leadership and service was sufficient to reduce the additional imprisonment time that he might have received in light of his role in the current offense. The trial court noted that Vanhorn had no prior criminal history.
The trial court concluded that in light of their histories, which showed no evidence that the current offense was part of a trend or pattern of criminal behavior, the defendants were unlikely to re-offend. The trial court noted that any term of imprisonment would result in some hardship to both Douglas' and Vanhorn's families. However, the trial court observed that the statutes for attempted armed robbery did not allow for a suspended or probated sentence, but rather mandated a hard labor sentence without the benefit of probation, parole, or suspension of sentence.
The trial court sentenced Douglas and Vanhorn to each serve a sentence of 12 years' imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. The defendants were given credit for any time already served. The trial court advised them of their right to appeal and the time delays to seek post-conviction relief.
Douglas filed a motion to reconsider sentence on March 12, 2018, and asserted that his sentence was excessive in light of his lawful behavior during the long pendency of his case, the fact that he is the married father of three daughters, and other mitigating factors. The trial court *381 denied the motion. The trial court noted in its written ruling that it had carefully and thoroughly considered and weighed both the aggravating and mitigating factors, including Douglas' lawful behavior and his family situation, in crafting the sentence. Douglas moved to appeal his conviction and sentence on March 7, 2018. The motion was granted March 13, 2018. Douglas does not challenge his sentence on appeal.
DISCUSSION
In Douglas' sole assignment of error, he argues the trial court erred in its statement of law regarding robbery; thus, the State failed to sufficiently prove he was guilty of attempted armed robbery. Douglas argues that the trial court erred in finding that he and Vanhorn could not claim "self-help" as a justification defense for their conduct. Douglas argues that he and Vanhorn merely sought to recover Vanhorn's own property, the money that Vanhorn allegedly gave to Jordan. Douglas contends that the evidence was insufficient to support the attempted armed robbery conviction because the State failed to prove the defendants attempted to take anything belonging to Jordan Willis.
The State argues Douglas' arguments are more appropriately considered as a determination of credibility and weight of the evidence, rather than a determination of the sufficiency of the evidence. The State further asserts that even if Vanhorn voluntarily loaned Jordan money, the debt did not justify the use of force and violence to collect on the debt.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Steines , 51,698 (La. App. 2 Cir. 11/15/17), 245 So.3d 224, writ denied , 17-2174 (La. 10/8/18), 253 So.3d 797.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Cooley , 51,895 (La. App. 2 Cir. 5/23/18), 247 So.3d 1159 ; State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So. 2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Cooley, supra. Moreover, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Cooley, supra .
The appellate court does not assess the credibility of witnesses or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Brooks , 52,249 (La. App. 2 Cir. 9/26/18), 256 So.3d 524. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. State v. Brooks, supra .
*382 Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act. La. R.S. 14:10(1). Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Fields , 42,761 (La. App. 2 Cir. 1/9/08), 973 So.2d 973, writ denied , 2008-0469 (La. 9/26/08), 992 So.2d 983.
In order to prove the defendant guilty of attempted armed robbery, the state had to prove the elements set forth in La. R.S. 14:64 and La. R.S. 14:27. Armed robbery is defined in La. R.S. 14:64 as the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
An attempt is defined by La. R.S. 14:27 as any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
In an armed robbery prosecution, it is not necessary to prove that the property taken belonged to the victim; it is only essential that the accused was not the owner and that the victim had a greater right to possession of the property at the time of the taking than did the accused. State v. Bess , 45,358 (La. App. 2 Cir. 8/11/10), 47 So.3d 524, writ denied , 10-2368 (La. 2/25/11), 58 So.3d 456.
When the evidence presented at trial clearly establishes that the thing taken belonged to the victim, the reviewing courts consider whether the State met the elements required to support a conviction for robbery. In State v. McCormick , 98-0718 (La. App. 4 Cir. 6/9/99), 737 So.2d 926, 931, writ denied , 99-2009 (La. 1/14/00), 753 So.2d 207, the appellate court held that the record contained sufficient evidence to establish that the property at issue belonged to the accused and that ownership of the property never vested with anyone but the accused, therefore the conviction for armed robbery was not supported by the evidence. In State v. Rubin , 04-1588 (La. App. 3 Cir. 4/6/05), 899 So.2d 187, the victim did not dispute that the rings taken from her by her ex-finance belonged to him after their engagement ended. The third circuit reversed Rubin's conviction for robbery on grounds that the state failed to show that the accused took something belonging to another. Id.
La. R.S. 14:18 provides that the fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct and that a justification defense may be raised under the following circumstances:
(1) When the offender's conduct is an apparently authorized and reasonable fulfillment of any duties of public office; or
(2) When the offender's conduct is a reasonable accomplishment of an arrest which is lawful under the Code of Criminal Procedure; or
(3) When for any reason the offender's conduct is authorized by law; or
(4) When the offender's conduct is reasonable discipline of minors by their parents, tutors or teachers; or
(5) When the crime consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility; or
(6) When any crime, except murder, is committed through the compulsion of threats by another of death or great *383 bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed; or
(7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.
La. R.S. 14:19 addresses the use of force or violence in defense; La. R.S. 14:20 addresses justifiable homicide; La. R.S. 14:20.1 addresses death due to violence or suspicious circumstances when a claim of self-defense is raised; La. R.S. 14:21 addresses aggressors claiming self-defense; and, La. R.S. 14:22 addresses defense of others. The defense of justification is an affirmative defense that must be proven by a preponderance of the evidence. State v. Broussard , 49,240 (La. App. 2 Cir. 10/1/14), 149 So.3d 446, writ denied , 14-2308 (La. 1/15/16), 184 So.3d 702.
James, Jordan, and Dillon all asserted that they were attacked by intruders who taped Jordan's and James' hands, feet, and heads with duct tape. Officers found Jordan and James with duct tape on their wrists and hands. Dillon asserted that he was struck in the face by the larger of the intruders with a black semiautomatic handgun. Officers found Dillon with blood on his face and suspected blood on his clothes, while a shirt with suspected blood and a black, semiautomatic handgun were found in Douglas' home, along with Vanhorn's business card and a knife with Vanhorn's name on it. Duct tape was found in Douglas' trunk. Vanhorn admitted to officers that he went to the Willis house that day with the intent to take money from Jordan Willis. Furthermore, Vanhorn admitted to officers that he intended to take the money by use of force because he brought the duct tape to bind Jordan up and he brought Douglas to deter Jordan from resisting.
James', Jordan's, and Dillon's 2017 trial testimonies were consistent with their statements made to police on October 27, 2010, and were corroborated by the officers' observations and evidence gathered while investigating the crime. Viewing this evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of attempted armed robbery beyond a reasonable doubt.
As noted by the trial court, Douglas' and Vanhorn's assertion, that their conduct was justified because they were attempting to retrieve Vanhorn's own property, is without merit. Jordan denied knowing Vanhorn and denied that Vanhorn loaned him any money. There was no evidence in the record to support the assertion that Vanhorn loaned Jordan any money or that anything belonging to Vanhorn was in Jordan's possession. As noted by the trial court in its reasons for the guilty verdict, even assuming that Vanhorn did loan Jordan money, the law does not provide for a "self-help" defense as justification for committing a home invasion in order to use force and intimidation to recover a debt. This assignment is without merit.
CONCLUSION
For the foregoing reasons, Robert Stuart Douglas' conviction and sentence are affirmed.
AFFIRMED.

On January 16, 2019, this case was consolidated for docketing purposes only with No. 52,583-KA, the case of Douglas' codefendant, James Micah Vanhorn.

The "FACTS" section in each opinion of these consolidated cases is the same, but is duplicated for convenience of the reader.